Dear Gentleman,
Each of your requests for an Attorney General's Opinion has been assigned to me for research and reply. You all have asked for clarification on several issues surrounding the enforcement and application of Louisiana's new Smoke-Free Air Act and formally seek an opinion from this office.
District Attorney DeRosier asks for clarification on the following questions:
 1. If a business is initially licensed as a bar and eventually sells more food than alcohol, do they become a restaurant under LSA-R.S. 40:1300.253? For example, if a business does $100,000.00 of business a year, and eventually the food sales are $51,000.00 and the alcohol sales are $49,000.00, while the profit margin on food is 5%, compared to an 80% profit on alcohol, is this business fairly categorized as a restaurant, such that smoking would be prohibited?
 2. Should the business' initial license be considered in determining whether it is a bar or a restaurant under the statute? *Page 2 
 3. How is the primary purpose of the business determined under LSA-R.S. 40:1300.253, and how do we qualify the sale of food as incidental to the consumption of alcoholic beverages under LSA-R.S. 40:1300.253(1)?
The first of Representative Erdey's two (2) requests seeks an Attorney General's Opinion on how the Louisiana Smoke-free Air Act would apply relative to Denham Springs Fire District 5 personnel smoking in the bay area of the fire department building. The request indicates that the bay area, which houses fire trucks and other emergency response vehicles, contains bay doors that remain open most of the time.
Representative Erdey's second request seeks an opinion regarding how the Louisiana Smoke-free Air Act applies to the Livingston Parish Literacy and Technology Center. The second request indicates that the Livingston Parish Literacy and Technology Center ("Technology Center") is a collaborative endeavor between the Livingston Parish School System and Southeastern Louisiana University. Southeastern Louisiana University owns the Technology Center building, while the Livingston Parish School System owns the land. The request goes on to indicate that Southeastern would like to establish a smoker's pavilion at the Technology Center for the Southeastern student population and for other adult events and/or training sessions, and further indicates that some Livingston High School classes take place in the building.
District Attorney Michael Harson's request questions how the Louisiana Smoke-free Air Act would apply to private clubs. The request specifically mentions a private club in Crowley, Louisiana which is exclusively for members only. Dues are paid monthly and no individual is allowed access to the club unless they are a member, or they are a member's guest. Individuals are not allowed entry for no more than two or three times before they are required to become a member. The request goes on to indicate that the club operates financially on the sale of food, on the sale of alcohol, and on the club member's dues. Specifically, the following questions are asked:
 1. Is the private club exempt from La.R.S. 40:1300 because of its legal status as a private corporation with only private membership and attendance?
 2. If the private club is subject to the above referenced state statute, if the bar is completely closed off from the restaurant with the only access being from the outside, will this meet the criteria of the new anti-smoking law?
Our response to each of your requests is below. *Page 3 
Act 815 of the 2006 Regular Session of the Louisiana Legislature enacted what is commonly referred to as the Louisiana Smoke-free Air Act ("Smoke-free Act").[1] The Smoke-free Act, which became effective January 1, 2007, was enacted to preserve and improve the health, comfort, and environment of the people of Louisiana by limiting exposure to tobacco smoke.[2] Essentially, the Smoke-free Act prohibits and bans smoking in a number of specifically defined locations, while expressly exempting other locations from the ban. The Smoke-free Act attempts to clearly define these exempted areas and further provides penalties for violating certain provisions of the act.
In order to address the questions presented by District Attorney DeRosier, Representative Erdey, and District Attorney Michael Harson we must first turn to the language of the Smoke-free Act itself.[3]
Specifically, with respect to District Attorney DeRosier's questions, we must look to how the Smoke-free Act defines a restaurant and a bar.
Generally, Louisiana Revised Statute 40:1300.256 provides the following:
 § 1300.256. General smoking prohibitions: exemptions
 A. Except as permitted by Subsection B of this Section, no person shall:
 (1) Smoke in any public building. *Page 4 
(2) Smoke in any school.
 (3) Smoke in any public place and in any enclosed area within a place of employment.
 (4) As an employer, knowingly permit smoking in any enclosed area within a place of employment. (Emphasis Added).
The Smoke-free Act defines a public place as "an enclosed area to which the public is invited or in which the public is permitted which is not a public building, including but not limited to banks, educational facilities, health care facilities, hotel and motel lobbies, laundromats, public transportation facilities, reception areas, restaurants, retail food production and marketing establishments, retail service establishments, retail stores, shopping malls, sports arenas, theaters, and waiting rooms". See La.R.S. 40:1300.253(9).
Under the Smoke-free Act, a restaurant is defined as:
 (10) "Restaurant" means an eating establishment, including but not limited to, coffee shops, cafeterias, sandwich stands, and school cafeterias, which gives or offers for sale food to the public, guests, or employees, as well as kitchens and catering facilities in which food is prepared on the premises for serving elsewhere. The term "restaurant" shall include a bar located within a restaurant.
Thus, following the specific language of the statute, if an establishment "gives or offers for sale food to the public, guests, or employees" it is considered a restaurant for purposes of the Smokefree Act, and accordingly it is a public place and smoking is prohibited therein. This no smoking ban would apply throughout the establishment, including any bars or lounges located within. See La.R.S. 40:1300.253(10). Such ban would apply regardless of the establishment's percentage or volume of food sales. From the language of the statute, the critical inquiry is whether the establishment "gives or offers for sale food to the public, guests, or employees". If an establishment does so, it is a restaurant under the Smoke-free Act.
Thus, with respect to District Attorney DeRosier's second question above, although we believe that a business' initial license should be considered, it should not be the determining factor. For example, as stated above, the Smoke-free Act specifically exempts certain establishments from the no smoking ban. One of these specifically exempted establishments is a bar. Accordingly, even though an establishment may sell or offer for sale food to the public, guests, or employees, it may still qualify as a bar *Page 5 
under the Smoke-free Act. As a result, the no smoking ban would not apply and the public would be free to smoke therein.
The Smoke-free Act defines a bar as "a business that holds a Class A-General retail permit and the primary purpose of such business is to serve alcoholic beverages for consumption by guests on the premises and in which the serving of food is only incidental to the consumption of those beverages, including but not limited to, taverns, nightclubs, cocktail lounges, and cabarets." See La.R.S. 40:1300.253 (emphasis added).
Thus, it appears the first condition that must be satisfied before an establishment may be classified as a "bar" under the Smoke-fee Act is the possession of a Class A-General Retail Permit. Once it is determined that an establishment lawfully possesses a valid Class A-General Retail Permit, a determination then must be made as to whether the primary purpose of such business is to serve alcoholic beverages for consumption by guests on the premises and if the serving of food is only incidental to the consumption of those beverages.
Unfortunately, a review of the Smoke-free Act fails to reveal a definition for the words primary purpose and only incidental. Neither does it reveal a clear indication as to what were the intended meanings of these words. Nonetheless, we do note that Webster's II, New Riverside University Dictionary defines primary as: "first or best in degree, quality, or importance", while incidental is defined as: "of a minor, casual, or subordinate nature". Further, other laws on similar subject matter provide some guidance on the meaning of these terms.
The Louisiana Alcoholic Beverage Control Law ("Alcoholic Beverage Law"), which is referenced by the Smoke-free Act, lists the criteria for obtaining alcohol permits in the State of Louisiana. Section 73 of the Alcoholic Beverage Law provides for the issuance of what is known as a special Class "R" restaurant permit. See La.R.S. 26:73. Under the Alcoholic Beverage Law, a restaurant is defined as an establishment which, among other things, operates a place of business whose purpose and primary function is to take orders for and serve food and food items. Id. (emphasis added).
The Louisiana Office of Alcohol and Tobacco Control, the entity charged with enforcing the provisions of the Alcoholic Beverage Law, has interpreted the purpose and primary function requirement of La.R.S.26:73 (a) as requiring an establishment to derive at least fifty (50%) percent of its revenues from the sale of foods. The Office of Alcohol and Tobacco Control monitors businesses for compliance with this fifty (50%) percent requirement and periodically audits the financial records of those businesses. We believe a similar standard would be a reasonable interpretation of the primary purpose and only incidental requirements of Section 1300.253 (1) of the Smoke-free Act. Such a standard arguably conforms with the ordinary meanings of the words primary and *Page 6 
incidental, and debatably is consistent with the logic, purpose, and intention of the Legislature in enacting the Smoke-free Air Act.
Nevertheless, without a clear mandate from the Legislature, this office is not in a position to give a definitive answer as to how the primary purpose of a business is determined or how to qualify or quantify sale of food which is incidental. Further, it is clear that such a determination would undoubtedly entail a detailed factual inquiry. As a general rule, the Attorney General's refrains from conducting factual evaluations. As such, we are not in a position to offer a response to questions (1) and (3) of District Attorney DeRosier's request. We believe such a pronouncement is properly the job of the Courts.[4]
Turning attention now to Representative Erdey's first request concerning the Denham Springs Fire District 5, we note that the Smoke-free Act specifically prohibits smoking in public buildings, public places, and enclosed areas of employment. We believe that the bay area of the Denham Springs Fire District 5 would fit into these categories, regardless of whether the bay area doors remain open. The fire district building is presumably owned by the municipality, if not, it is undoubtedly a place where the public is permitted, and further is an enclosed area within a place of employment. Accordingly, smoking is prohibited therein.
With respect to Representative Erdey's second request concerning the Technology Center, we note that in addition to prohibiting smoking in public buildings and public places, the Smoke-free Act prohibits smoking in any school. Under the Smoke-free Act, a school is defined as any elementary or secondary school building, the campus of any school, any buildings on the campus, and all school buses. The Technology Center is situated on land that is owned by the Livingston Parish School System. Further, some Livingston Parish High School classes occur in the Technology Center. Under the facts presented, we are of the opinion that the Technology Center would be categorized as a school and accordingly smoking is prohibited within the Technology Center, as well as throughout the campus.
Similarly, it is this office's belief that smoking would be prohibited within the private club mentioned in District Attorney Michael Harson's request. Section 1300.256 (B) of the Smoke-free Act specifically lists the places that are exempt from the no smoking ban. Private clubs are not listed. Based on the information provided to this office and the specific language of the statute, it appears that the private club would be considered an enclosed area within a place of employment. See La.R.S. 1300.253(5)(7). Accordingly, smoking is prohibited therein. With respect to District Attorney Harson's second question, we believed under the facts presented, provided the bar possesses a valid Class-A General Retail permit and the sale of alcoholic beverages is its primary purpose *Page 7 
and the sale of food is only incidental, it would be exempt under the Smoke-free Act and smoking would be permitted therein.
Gentleman, we hope this adequately responds to each of your requests. If you should have any questions about the response contained herein or need additional clarification, please feel free to contact our office for further assistance.
 Yours very truly,
 JAMES D. "BUDDY" CALDWELL ATTORNEY GENERAL
 BY: __________________________ MICHAEL J. VALLAN Assistant Attorney General
 JDC/MJV/crt
[1] Louisiana Revised Statutes 40:1300.251 to 40:1300.263.
[2] La.R.S. 40:1300.252.
[3] Addressing each of the questions presented involves the task of statutory interpretation. This office recognizes that it is subject to the general rules regarding statutory interpretation as expressed by the Louisiana Supreme Court in Pumphrey v. City of New Orleans, 05-979, p. 10-12 (La. 4/4/06), 925 So.2d 1202, 1209-10. There, the Louisiana Supreme Court summarized the rules of statutory interpretation as follows:
 The fundamental question in all cases of statutory interpretation is legislative intent and the ascertainment of the reason or reasons that prompted the Legislature to enact the law. The rules of statutory construction are designed to ascertain and enforce the intent of the Legislature. Legislation is the solemn expression of legislative will, and therefore, interpretation of a law involves primarily a search for the Legislature's intent.
 When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the Legislature. When the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law, and the words of law must be given their generally prevailing meaning. When the words of a law are ambiguous, their meaning must be sought by examining the context in which they occur and the text of the law as a whole, and laws on the same subject matter must be interpreted in reference to each other.
 The meaning and intent of a law is determined by considering the law in its entirety and all other laws on the same subject matter and placing a construction on the provision in question that is consistent with the express terms of the law and with the obvious intent of the Legislature in enacting it. The statute must, therefore, be applied and interpreted in a manner, which is consistent with logic and the presumed fair purpose and intention of the Legislature in passing it. This is because the rules of statutory construction require that the general intent and purpose of the Legislature in enacting the law must, if possible, be given effect. Courts should give effect to all parts of a statute and should not give a statute an interpretation that makes any part superfluous or meaningless, if that result can be avoided. It is likewise presumed that the intention of the legislative branch is to achieve a consistent body of law. (Citations Omitted).
[4] It is the Courts that should give effect to all parts of a statute. Pumphrey v. City of New Orleans, 05-979, p. 10-12 (l.a.4/4/06),925 So.2d 1202, 1209-10.